IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PURE BRAZILIAN USA LLC,<br><br>    Plaintiff,<br><br>v.<br><br>CHRISTINE MEDRICK,<br><br>    Defendant. | Civil Action No.:<br><br>**JURY TRIAL DEMANDED** |

### COMPLAINT

Plaintiff, Pure Brazilian USA LLC ("PB" or "Plaintiff"), by and through its attorneys, hereby alleges its Complaint against Defendant Christine Medrick ("Medrick" or "Defendant"), on personal knowledge as to their own activities and on information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1. This is an action for breach of contract, tortious interference, and related claims arising out of the actions of Medrick. Specifically, this action arises out of Medrick's willful breach of a non-compete agreement entered into by and between PB and Medrick, and related communications made by Medrick to third parties, including a potential distributor of PB.

### THE PARTIES

2. Plaintiff is a New York limited liability company with its principal place of business located at 15 Holt Drive, Stony Point, NY 10980.

3. Upon information and belief, Defendant, Christine Medrick, is over eighteen (18)

years of age and is a citizen of Arizona with a residential address located at 14455 N Adero Canyon Dr, Fountain Hills, Arizona 85268.

## JURISDICTION AND VENUE

4. Subject matter jurisdiction over the claims is conferred upon the Court at least by 28 U.S.C. § 1332 (diversity jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction).

5. This Court has diversity jurisdiction over this matter since this suit is between a New York limited liability company having a principal place of business in New York on the one hand, and a foreign citizen of Arizona having a place of residence in Arizona, and the amount in controversy exceeds $75,000.

6. Personal jurisdiction and venue are appropriate at least because Defendant consents to this venue and the Court's jurisdiction. Specifically, the APA provides, *inter alia*:

> The parties acknowledge that a substantial portion of the negotiations, anticipated performance and execution of this Agreement occurred or shall occur in New York County, New York. Any civil action or legal proceeding arising out of or relating to this Agreement shall be brought exclusively in the courts of record of the State of New York in New York County or the U.S. District Court in New York County. Each party consents to the jurisdiction of such court in any such civil action or legal proceeding and waives any objection to the laying of venue of any such civil action or legal proceeding in such court.

7. This Court also has personal jurisdiction over Defendant because, upon information and belief, Defendant has availed herself of the rights and benefits of the laws of New York, has derived substantial revenue from New York, has systematic and continuous business contacts with New York, has committed acts giving rise to this action within New York and within this District, and a substantial portion of the negotiations, anticipated performance, and execution of the contracts at issue occurred in New York.

8. Venue is also proper in this District pursuant to 28 U.S.C. § 1391, at least because

Plaintiff's principal place of business is within this District, and a substantial part of the acts or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### Plaintiff's Background

9. PB is a manufacturer and seller of high-quality beauty and haircare products. PB sells its products across the U.S. under brand names including "Pure Brazilian" and "Always Blonde," and utilizes a wide network of distributors to sell its products. PB is highly respected among its distributor network.

10. On July 20, 2023, PB entered into an asset purchase agreement ("APA") with Defendant, who at the time was an owner of CC Beauty Collection, Inc. ("CCbeauty").

11. CCbeauty is a business that manufactured and sold a brand of beauty and haircare products sold in professional beauty shops, online, and through other means under the brand names or trademarks "Pure Brazilian" and "Always Blonde."

12. The APA provided for the sale of substantially all of the assets of CCbeauty, including the brand names or trademarks "Pure Brazilian" and "Always Blonde," from CCbeauty to PB. PB agreed to pay two million dollars ($2,000,000) plus an Inventory Payment in full consideration for the APA. The Inventory Payment is due by no later than December 31, 2023.

13. PB and Defendant also entered into a Secured Non-Negotiable Promissory Note on July 20, 2023 (the "Promissory Note"), which required a portion of the consideration for the APA to be paid out over a series of installments.

14. To date, PB has paid every installment to Defendant as required by the Promissory Note. The next installment as required by the Promissory Note is due by December 31, 2023.

15. After the acquisition of CCbeauty PB sought to grow its business in one of the

U.S.'s largest markets—California. As part of this, PB invested a significant amount of time and money in a number of investments. These investments included hiring a head of sales, a product educator, at least two sales staff members, and establishing and growing a distributor network in California.

16. As a result of PB's efforts, PB developed a strong business relationship of Sevak Orujyan, a representative of Daily Beauty Needs LLC d/b/a Beauty Sign ("DBN"). DBN is a product distributor of products in California.

17. Resulting from various discussions, DBN agreed to act as an exclusive distributor of PB's products in southern California, and DBN subsequently placed a product order with PB totaling ten thousand dollars ($10,000) (the "Order"). The products sold in the Order were expected to be distributed into Southern California.

18. PB expected its relationship with DBN to be long term and to produce significant revenue and economic advantage for PB. For example, as detailed in an email sent to Defendant on November 15, 2023 (the "Email"), PB planned to "advis[e] all existing and future California costumers that orders will be processed to distributors which [PB] will identify," including DBN. A true and correct copy of the Email is attached herewith as **Ex. A**.

**Defendant's Wrongful Actions**

19. As part of the APA, Defendant, as an individual, entered into a non-compete agreement with PB on July 20, 2023 (the "NCA").

20. In Section 1.03 of the NCA, Defendant agreed that:

> at no time . . . shall Defendant . . . advise, direct or suggest in any manner to a third party . . . that such third party (a) stop having or reduce such existing relationship with [PB], (b) not start having such a relationship with [PB], (c) during the Non-compete Period, start or increase such a relationship with any business for the

> Products engaged in the Industry Segment in the United States other than [PB], or (d) otherwise disparage [PB] or any person or entity affiliated with [PB].

21. Following the APA and NCA, Defendant maintained a non-binding and non-exclusive relationship with PB as a distributor of PB's products. This relationship was not subject to any written or verbal contract.

22. As part of its operations and to help gauge its performance in certain markets, PB required all its distributors to provide PB with a list of all customers the distributor has sold to. However, the relationship between PB and Defendant became strained when Defendant refused PB's request for such a list.

23. Further, PB became aware that—without PB's knowledge or authorization—Defendant had been selling PB's products above the manufacturer's suggested retail price ("MSRP"). Defendant had also failed to adjust her pricing of PB's products to reflect occasional discounts implemented by PB.

24. In short, Defendant abused its relationship with PB by effectively acting as a reseller, and not as a distributor.

25. On November 15, 2023, PB sent the Email to Defendant. The Email informed Defendant, *inter alia*, that PB would be terminating its relationship with Defendant effective December 1, 2023. The Email stated "we have regretfully come to the conclusion that a continuing relationship with you does not fit in with our developing a cohesive network of relationships that will enable us to put our current goal of bringing the marketing of the Brand to the next level into full effect," and "[a]s of the sending of this message to you, you have [PB]'s support to sell your existing inventory to your existing customers until December 1, 2023. [PB] is going to be advising all existing and future California costumers that orders will be processed to distributors which [PB]

will identify."

26.     Notwithstanding the above and having full knowledge of the terms contained within the NCA, Defendant began a worrying campaign of bullying third party distributors in an attempt to prevent such distributors from doing business with PB. Defendant began such acts **despite PB having terminated its relationship with Defendant, and there being no agreement or authorization by PB granting Defendant exclusivity as a distributor**.

27.     As part of this campaign, and with knowledge of PB's relationship with DBN, Defendant sent several threatening messages to DBN (the "Messages"). Specifically, after placing the Order with PB, Defendant sent several messages on or around December 10, 2023, to Sevak Orujyan ("Steve"). Some of these messages are reproduced below:




28.     As shown above, Defendant sent the Messages to Sevak Orujyan threatening legal action for **legally** selling PB's products in California.

29.     When sending the Messages, Defendant had no standing to threaten legal action against Sevak Orujyan and/or DBN for selling PB's products since Defendant had no relationship with PB and any such relationship had been terminated. Further, since executing the APA and NCA, Defendant has no rights in PB's products or over the exclusive sale of such products.

30.     At the time of sending the Messages to DBN, Defendant knew she had no rights in PB's products or over the exclusive sale of such products.

31. At the time of sending the Messages to DBN, Defendant knew she had no standing to bring a lawsuit against DBN.

32. Defendant sent the Messages to DBN in bad faith and with the sole intention to direct that DBN cease its business relationship with PB and to induce DBN to terminate the Order.

33. As a direct result of the Messages, DBN then cancelled the Order with PB on or around December 10, 2023, and ceased doing business with PB.

34. Upon information and belief, Defendant has made several other statements to actual or potential customers and/or distributors of PB's products, including falsely alleging that Defendant is the owner of PB.

35. Upon information and belief, and after Defendant executed the Contracts, Defendant has made several statements to potential customers and/or distributors of PB's products that Defendant is the owner and source of PB's products (the "Ownership Statements"), including those sold under the marks "Pure Brazilian" and "Always Blonde."

36. The Ownership Statements are false. Since executing the Contracts, Defendant has not been an owner of PB or the marks "Pure Brazilian" and "Always Blonde."

37. Defendant made such statements to deceive potential customers and/or distributors of PB's products into falsely believing that Defendant is the source of PB's products.

38. Upon information and belief, Defendant is making these false allegation to interfere with PB's hard-earned business relationships, and to prevent distributors from doing business with PB.

## COUNT I
### (BREACH OF CONTRACT – NCA)

39. Plaintiff re-alleges and incorporates the allegations of all of the paragraphs in this complaint as if fully set forth herein.

40. On July 20, 2023, PB and Defendant entered into a valid, enforceable, and binding contracts, the APA and NCA (the "Contracts"), which are made a part hereof and incorporated herein by reference.

41. PB agreed to pay two million dollars ($2,000,000) plus an Inventory Payment in full consideration for the contracts (the "Consideration").

42. In exchange for PB agreeing to pay the Consideration, and pursuant to the NCA, Defendant agreed, *inter alia*, that:

> at no time . . . shall Defendant . . . advise, direct or suggest in any manner to a third party . . . that such third party (a) stop having or reduce such existing relationship with [PB], (b) not start having such a relationship with [PB], (c) during the Non-compete Period, start or increase such a relationship with any business for the Products engaged in the Industry Segment in the United States other than [PB], or (d) otherwise disparage [PB] or any person or entity affiliated with [PB].

43. PB has performed its obligations under the contracts.

44. All conditions precedent have been satisfied.

45. PB has, to date, executed all payments required by the Promissory Note.

46. On or around December 10, 2023, Defendant materially and substantially breached the NCA.

47. Specifically, Defendant breached at least Section 1.03 of the NCA by sending the Messages to DBN directing DBN to stop having a business relationship with PB.

48. As a direct and proximate result of Defendant's breach, PB has suffered, and will continue to suffer damages.

49. The damages flow directly from and are the natural and probable consequences of

Defendant's breach.

50. Pursuant to Section 4.02 of the NCA, PB is entitled to all expenses incurred in the present action, including reasonable attorneys' fees.

## COUNT II
### (BREACH OF CONTRACT – APA)

51. Plaintiff re-alleges and incorporates the allegations of all of the paragraphs in this complaint as if fully set forth herein.

52. Section 1.7 of the APA incorporated the terms of the NCA, including Section 1.03 of the NCA, by reference.

53. All conditions precedent have been satisfied.

54. On or around December 10, 2023, Defendant materially and substantially breached the APA.

55. Specifically, Defendant breached the APA by materially and substantially breaching the NCA.

56. As a direct and proximate result of Defendant's breach, PB has suffered, and will continue to suffer damages.

57. The damages flow directly from and are the natural and probable consequences of Defendant's breach.

58. Pursuant to Section 4.02 of the NCA, PB is entitled to all expenses incurred in the present action, including reasonable attorneys' fees

## COUNT III
### (TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE)

59. Plaintiff re-alleges and incorporates the allegations of all of the paragraphs in this complaint as if fully set forth herein.

60. Defendant had a business opportunity and relationship with DBN. Specifically, DBN was to act as a product distributor for PB in California and was expected to execute the Order with PB.

61. Defendant had an expectation of business with other distributors with whom PB held a good reputation.

62. PB had fostered a strong reputation with its distributors, including with DBN.

63. Defendant knowingly threatened DBN to force DBN to cancel the Order and cease doing business with PB.

64. Upon information and belief, Defendant made false representations, such as the Ownership Statements, to other distributors of PB, including falsely claiming that Defendant is the owner of DB and the marks "Pure Brazilian" and "Always Blonde."

65. Defendant acted in bad faith and used wrongful and oppressive means and tactics, for wrongful motives, in interfering with plaintiff's prospective advantageous business relations with DBN by threatening legal action against DBN for selling PB's products, despite PB having terminated its relationship with Defendant and Defendant holding no rights in PB's products.

66. Defendant acted in bad faith and used wrongful and oppressive means and tactics, for wrongful motives, in interfering with plaintiff's prospective advantageous business relations with other distributors by making the Ownership Statements, knowing that she held no ownership in PB or the marks "Pure Brazilian" and "Always Blonde."

67. Defendant, at the time of sending the Messages, knew that she had no rights in PB's products.

68. Defendant, at the time of making the Ownership Statements, knew that she had

no ownership of in PB or the marks "Pure Brazilian" and "Always Blonde."

69. The damage to plaintiff's business relationship with DBN would not have occurred but for Defendant's activities in that Defendant caused DBN to cancel the Order with PB and to cease its business relationship with PB.

70. The damage to plaintiff's business relationship with other distributors would not have occurred but for Defendant's activities in that Defendant harmed PB's reputation with its distributors.

71. As a result of Defendant's conduct, PB has suffered damages in the amount of at least one hundred thousand dollars ($100,000) in that PB has lost the expectation of current and future sales to DBN and other distributors.

72. The damages flow directly from and are the natural and probable consequences of Defendant's wrongful conduct.

73. As a result of the Defendant's interference with PB's prospective business advantage, Plaintiff has suffered incidental damages in the amount of at least one hundred thousand dollars ($100,000) in that PB spent significant time and money marketing to distributors, including DBN, and hired additional staff to support its business development in California, including staff to handle sales to distributors, including DBN.

74. Defendant's misconduct evinced such a high degree of moral culpability as to warrant punitive damages.

75. PB is entitled to punitive damages against Defendant in an amount to be determined at a trial.

## COUNT IV
### (TORTIOUS INTERFERENCE WITH CONTRACT)

76. Plaintiff re-alleges and incorporates the allegations of all of the paragraphs in this complaint as if fully set forth herein.

77. PB and DBN entered into a Purchase Order Agreement (the "Agreement"). The Agreement was at all relevant times a valid, binding and enforceable contract.

78. At all relevant times, Defendant was aware of the existence and terms of the Agreement.

79. On or around December 10, 2023, DBN terminated the Agreement.

80. Defendant intentionally and improperly facilitated DBN's termination of the Agreement by making threats to DBN for doing business with PB.

81. Defendant's conduct was without justification and improper.

82. The breach of Agreement would not have occurred but for Defendant's activities in that DBN would not have terminated the Agreement if not for Defendant's threats conveyed in the Messages.

83. As a result of Defendant's inducement of DBN to terminate, PB has suffered damages in an amount to be determined at trial in that PB lost sales of its products.

84. The damages flow directly from and are the natural and probable consequences of Defendant's inducement of DBN's termination of the Agreement.

85. Defendant's misconduct evinced such a high degree of moral culpability

as to warrant punitive damages.

86. PB is entitled to punitive damages against Defendant in an amount to be determined at trial.

87. Plaintiff is entitled to interest on the forgoing sums plus the costs of this action.

## COUNT V
### (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

88. Plaintiff re-alleges and incorporates the allegations of all of the paragraphs in this complaint as if fully set forth herein.

89. The contracts between Plaintiff and Defendant are or were existing contracts. The contracts include an implied covenant of good faith and fair dealing.

90. Defendant acted in bad faith, and with improper motive, as described herein, in breach of the implied covenant of good faith and fair dealing.

91. Defendant's actions violated the reasonable and justifiable expectations of Plaintiff under the terms of the agreements, and have the effect of injuring Plaintiff's rights to receive the fruits of the agreements.

92. In particular, Defendant's actions caused Plaintiff injury due to its loss of revenue and funds.

93. Defendant's breaches were and are a substantial factor in directly and proximately causing damages to Plaintiff.

## COUNT VI
### (UNFAIR COMPETITION)

94. Plaintiff re-alleges and incorporates the allegations of all of the paragraphs in this complaint as if fully set forth herein.

95. Defendant's misrepresentations of the source of PB's products/goods, including by passing off PB's products as Defendant's own, is likely to cause confusion, or to cause mistake, or to deceive as to the origin or source of Defendant's products.

96. As a result of Defendant's unauthorized and wrongful conduct, the public is likely to be confused as to whether Defendant's products and business are associated with PB.

97. Defendant's conduct is willful and violates Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

98. Defendant's conduct is ongoing, is causing irreparable injury to PB, and will continue to both damage PB and deceive the public unless enjoined by this Court.

99. PB has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment as follows:

A. Granting judgment in favor of Plaintiff and against Defendant on all claims and a final judgment incorporating the same;

B. An award of actual damages to Plaintiff;

C. An award of restitution and disgorgement of any ill-begotten profits;

D. Adjudging that Defendant has breached the Contracts between the parties;

E. Adjudging that Defendant has tortiously interfered with Plaintiff's prospective business advantage;

  F.  Adjudging that Defendant has tortiously interfered with contract;

  G.  Adjudging that Defendant has breached the implied covenant of good faith and fair dealing;

  H.  Adjudging that Defendant wrongfully passed of PB's products as her own;

  I.  Granting an injunction temporarily, preliminarily, and permanently enjoining Defendant, her employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and all of those in active concert and participation with any of the foregoing persons or entities from:

  (a) Making any use of the "Pure Brazilian" or "Always Blonde" marks, or any designation of origin confusingly similar thereto, including offering to sell, selling, distributing, or importing into the U.S. PB's products bearing the "Pure Brazilian" or "Always Blonde" marks;

  (b) Infringing or diluting any of PB's trademarks;

  (c) Unfairly competing with PB in the manufacture, importation, advertising, offering for sale, sale, shipment and/or distribution of PB's products;;

  (d) Assisting, aiding or abetting any other person or business entity in engaging in or performing any of the aforementioned activities; and

  (e) Tortiously interfering with PB's current and potential customers and distributors.

  J.  Order Defendants, pursuant to 15 U.S.C. § 1116, to serve on PB within thirty (30) days after service on Defendants of a preliminary or permanent injunctive order, a report in writing,

under oath, setting forth in detail the manner and form in which Defendant has complied with the injunction.

  K. Ordering an accounting by Defendant of all gains, profits and advantages derived from its wrongful acts;

  L. Ordering third parties to freeze Defendant's accounts;

  M. Ordering Defendant to account for, and pay over to Plaintiff, Defendant's profits and all damages sustained by Plaintiff;

  N. Increase the amount of damages and/or profits awarded to Plaintiff, as provided by law;

  O. Awarding Plaintiff the fees, costs and disbursements, and interest, expended in connection with any actions taken to investigate and confirm the claims made herein;

  P. Declaring Plaintiff as the prevailing party and awarding Plaintiff its reasonable attorneys' fees as provided by the Contracts and by law;

  Q. Ordering that Defendant pay all fees, expenses, and costs associated with this action as provided by the Contracts and by law;

  R. Award Plaintiff its reasonable attorneys' fees, costs, disbursements, and interest, including pre-judgment interest and post-judgment interest, as provided by the Contracts and by law; and

  S. Grant such other and further relief as the Court may deem just and proper.

Dated: December 18, 2023
    New York, New York

/s/ Andrew D. Bochner
Andrew D. Bochner, Esq.
Bochner PLLC
1040 Ave. of the Americas, 15th Fl.
New York, New York 10018
(646) 971-0685
Andrew@Bochner.Law