**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PURE BRAZILIAN USA LLC,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>CHRISTINE MEDRICK, and<br><br>YVETTE FELIX-TSABOUKOS,<br><br>　　　　　Defendants. | Civil Action No.: 1:23-cv-10946<br><br>**JURY TRIAL DEMANDED** |

## SECOND AMENDED COMPLAINT

Plaintiff, Pure Brazilian USA LLC ("PB" or "Plaintiff"), by and through its attorneys, hereby alleges its Complaint against Defendants Christine Medrick ("Medrick") and Yvette Felix-Tsaboukos ("Felix-Tsaboukos" and, collectively with Medrick, "Defendants"), on personal knowledge as to its own activities and on information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.　　This is an action for breach of contract, tortious interference, false designation of origin, and related claims arising out of the actions of Medrick. Specifically, this action arises out of Medrick's willful breach of a non-compete agreement entered into by and between PB and Medrick, and related communications made by Medrick to third parties, including a potential distributor of PB.

## THE PARTIES

2.　　Pure Brazilian USA LLC is a New York limited liability company with two members, Soloman E. Silberstein and Joseph Indig, both of whom are individuals. Each member

of Pure Brazilian USA LLC resides in and is a citizen of New York. Plaintiff has a principal place of business located at 15 Holt Drive, Stony Point, NY 10980.

3.     Upon information and belief, Defendant Christine Medrick is over eighteen (18) years of age and is a citizen of Arizona with a residential address located at 14455 N Adero Canyon Drive, Fountain Hills, Arizona 85268.

4.     Upon information and belief, Defendant Felix-Tsaboukos is over eighteen (18) years of age and is a citizen of California, residing at 3121 Calzar Drive, San Jose, California 95118.

## JURISDICTION AND VENUE

5.     Subject matter jurisdiction over the claims is conferred upon the Court at least by 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332 (diversity jurisdiction), 28 U.S.C. § 1338(a) (actions arising under an Act of Congress relating to trademarks or copyrights), and 28 U.S.C. § 1367 (supplemental jurisdiction).

6.     This Court has diversity jurisdiction over this matter because this suit is between, on the one hand, a New York limited liability company having a principal place of business in and members who reside in New York and, on the other hand, foreign citizens residing in Arizona and California, and the amount in controversy exceeds $75,000.

7.     Personal jurisdiction and venue are appropriate at least because Medrick expressly consented to this venue and the Court's jurisdiction. Specifically, the APA which gives rise to this action provides, *inter alia*:

> The parties acknowledge that a substantial portion of the negotiations, anticipated performance and execution of this Agreement occurred or shall occur in New York County, New York. Any civil action or legal proceeding arising out of or relating to this Agreement shall be brought exclusively in

the courts of record of the State of New York in New York County or the U.S. District Court in New York County.  Each party consents to the jurisdiction of such court in any such civil action or legal proceeding and waives any objection to the laying of venue of any such civil action or legal proceeding in such court.

8.     This Court also has personal jurisdiction over both Defendants because, upon information and belief, Defendants have availed themselves of the rights and benefits of the laws of New York, have derived substantial revenue from New York, have systematic and continuous business contacts with New York, have committed acts giving rise to this action within New York and within this District, and a substantial portion of the negotiations, anticipated performance, and execution of the contracts at issue occurred in New York.

9.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391, at least because Plaintiff's principal place of business is within this District, and also because a substantial part of the acts or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### Plaintiff's Background

10.     PB is a manufacturer and seller of high-quality beauty and haircare products. PB sells its products across the U.S. under brand names including "Pure Brazilian" and "Always Blonde" and utilizes a wide network of distributors to sell its products. PB is highly respected among its distributor network.

11.     On or about July 20, 2023, PB entered into an asset purchase agreement ("APA") with Medrick, who at the time was an owner of CC Beauty Collection, Inc. ("CCbeauty").

12.     CCbeauty is a business that manufactured and sold a brand of beauty and haircare products sold in professional beauty shops, online, and through other means under the brand names or trademarks "Pure Brazilian" and "Always Blonde."

13.     The APA provided for the sale to PB of substantially all of the assets of CCbeauty, including various brand names or trademarks. Among the assets, CCbeauty conveyed the entire right and title in and to the marks "Pure Brazilian," U.S. trademark reg. nos. 5529282, 4151895 (the "PB Marks"), and "Always Blonde," U.S. trademark reg. no. 7226210 (the "Always Blonde Mark") (the PB Marks and Always Blonde Mark, collectively, the "Pure Brazilian Marks").

14.     The Pure Brazilian Marks are used in connection with various products, some of which are included below:



**Anti-Frizz Daily Shampoo**
from $28.00



**Anti-Frizz Daily Conditioner**
from $30.00



**Anti-Frizz Shampoo & Conditioner Duo**
from $48.00 $58.00
SALE



**Anti-Frizz Daily Leave-In Serum**
$30.00



Leave-In Conditioner
with Keratin
$28.00



Silk Smoothing Balm
$30.00

(the "Pure Brazilian Goods").

15.    In full consideration under APA, PB agreed to pay Two Million Dollars ($2,000,000) plus an Inventory Payment.

16.    Under the terms of the APA, the Inventory Payment is due by no later than December 31, 2023.

17.    Also, on or about July 20, 2023, PB and Medrick entered into a Secured Non-Negotiable Promissory Note (the "Promissory Note"), which required a portion of the consideration for the APA to be paid out over time via a series of installments.

18.    To date, PB has paid every installment due to Medrick as required by the Promissory Note. The next installment provided for under the Promissory Note is due by December 31, 2023.

19.    After the acquisition of substantially all of the assets of CCbeauty, PB sought to grow its business in one of the U.S.'s largest markets—California. Accordingly, PB invested a significant amount of time and money in a number of investments. These investments included hiring a head of sales, a product educator, at least two sales staff members, and establishing and growing a distributor network in California.

20.    As a result of PB's efforts, PB developed a strong business relationship of Sevak

Orujyan, a representative of Daily Beauty Needs LLC d/b/a Beauty Sign ("DBN"). DBN is a product distributor of products in California.

21.     Following various discussions, DBN agreed to act as an exclusive distributor of PB's products in southern California, and DBN subsequently placed a product order with PB totaling Ten Thousand Dollars ($10,000) (the "Order"). The products sold in the Order were expected to be distributed into Southern California.

22.     PB expected its relationship with DBN to be long-term and to produce significant revenue and economic advantage for PB. For example, as detailed in an email sent to Medrick on November 15, 2023 (the "Email"), PB planned to "advis[e] all existing and future California costumers that orders will be processed to distributors which [PB] will identify," including DBN. A true and correct copy of the Email is attached herewith as **Ex. A**.

**Medrick's Wrongful Actions**

23.     As part of the APA, Medrick, as an individual, covenanted not to compete with the business of PB (the "NCA").

24.     In Section 1.03 of the NCA, Medrick agreed that:

> at no time . . . shall [Medrick] . . . advise, direct or suggest in any manner to a third party . . . that such third party (a) stop having or reduce such existing relationship with [PB], (b) not start having such a relationship with [PB], (c) during the Non-compete Period, start or increase such a relationship with any business for the Products engaged in the Industry Segment in the United States other than [PB], or (d) otherwise disparage [PB] or any person or entity affiliated with [PB].

25.     Following the APA and NCA, Medrick maintained a non-binding and non-exclusive relationship with PB as a distributor of PB's products. This relationship was not subject to any written or verbal contract.

26.     As part of its operations and in order to help gauge its performance in certain

markets, PB required all its distributors to provide PB with a list of all customers to which the distributor had sold.  The relationship between PB and Medrick became strained when Medrick refused PB's request for such a list.

27.     Furthermore, PB became aware that—without PB's knowledge or authorization—Medrick had been selling PB's products above the manufacturer's suggested retail price ("MSRP"). Medrick had also failed to adjust her pricing of PB's products to reflect occasional discounts implemented by PB.

28.     In short, Medrick abused her relationship with PB by effectively acting as a reseller, and not as a distributor.

29.     On or about November 15, 2023, PB sent the Email to Medrick. The Email informed Medrick, *inter alia*, that PB would be terminating its relationship with Medrick effective as of December 1, 2023.

30.     The Email stated: "we have regretfully come to the conclusion that a continuing relationship with you does not fit in with our developing a cohesive network of relationships that will enable us to put our current goal of bringing the marketing of the Brand to the next level into full effect," and "[a]s of the sending of this message to you, you have [PB]'s support to sell your existing inventory to your existing customers until December 1, 2023. [PB] is going to be advising all existing and future California costumers that orders will be processed to distributors which [PB] will identify."

31.     Notwithstanding the above and despite having full and complete knowledge of the terms contained within the NCA, Medrick began a worrisome campaign of bullying third-party distributors in an attempt to prevent other distributors from doing business with PB. Medrick embarked upon this course **despite PB's prior termination of its relationship with Medrick and**

**despite there being no agreement by or authorization from PB granting Medrick exclusivity as a distributor**.

32.     As part of this campaign, and with knowledge of PB's business relationship with DBN, Medrick sent several threatening messages to DBN (the "Messages"). Specifically, after placing the Order with PB, Medrick sent to Sevak Orujyan ("Steve") of DBN a series of messages on or around December 10, 2023. Some of those messages are reproduced below:




33.     As shown above, Medrick sent the Messages to Steve of DBN and threatened legal action for DBN's **legal and authorized** selling of PB's products in California.

34.     When sending the Messages, Medrick had no standing, cause, or justification to threaten legal action against Steve and/or DBN for selling PB's products because Medrick had no relationship with PB and any such relationship that had previously existed had already been terminated. Moreover, since executing the APA and NCA, Medrick had and has had no rights in PB's products or over the exclusive sale of such products.

35.     At the time Medrick sent the Messages to DBN, Medrick knew she had no rights in PB's products, including the Pure Brazilian Goods, or over the exclusive sale of such products.

36.     At the time of sending the Messages to DBN, Medrick knew she had no standing, cause, or justification to bring a lawsuit against DBN related to the sale of PB's products.

37.     Medrick sent the Messages to DBN in bad faith and with the sole intention to harm PB's business relationship with DBN, to cause DBN to cease its business relationship with PB, and to induce DBN to terminate the Order.

38.     As a direct result of and following after the Messages, on or around December 10, 2023, DBN cancelled the Order it had placed with PB and ceased doing business with PB.

39.     Upon information and belief, Medrick has made several other statements to actual or potential customers and/or distributors of PB's products, including the Pure Brazilian Goods, which have damaged PB, including falsely claiming that Medrick is the owner of PB.

40.     Upon information and belief, after Medrick executed the Contracts, Medrick made several statements to potential customers and/or distributors of PB's products, including the Pure Brazilian Goods, that Medrick is the owner and source of PB's products and the Pure Brazilian Goods (the "Ownership Statements"), including those sold under the Pure Brazilian Marks.

41.     The Ownership Statements are false and were knowingly false when made. At least

since executing the Contracts, Medrick has not been an owner of PB or the Pure Brazilian Marks.

42.    Medrick made such statements to deceive potential customers and/or distributors of PB's products and Pure Brazilian Goods into falsely believing that Medrick is the source of such products.

43.    Upon information and belief, Medrick is making these false allegations in order to interfere with PB's hard-earned business relationships, to prevent distributors from doing business with PB, and to deceive buyers into purchasing products from Medrick based on the false belief that Medrick is authorized by Plaintiff to sell the Pure Brazilian Goods, and/or that Medrick and the Pure Brazilian Goods are otherwise affiliated with or sponsored by Plaintiff, and/or that Medrick is the source of the Pure Brazilian Goods, all to the detriment of PB.

**Felix-Tsaboukos Joins Medrick's Tortious Conduct**

44.    On December 19, 2023, PB received an email from one of its long-time customers (the "Customer") asking, in sum and substance, why PB's products are no longer available in California.

45.    The Customer had previously gotten PB's products through Felix-Tsaboukos, who used to be a sales representative for PB. Felix-Tsaboukos stopped being a sales representative for PB in April of 2023, when she quit.

46.    Notably, upon information and belief, Felix-Tsaboukos has a close relationship with Medrick.

47.    Upon further investigation, PB discovered that Felix-Tsaboukos was making material misrepresentations (including, but not limited to, the false statement that PB's products are not allowed to be sold in California) to PB's customer base, such as the Customer.

48.     PB also discovered that Felix-Tsaboukos had recruited an unauthorized individual and/or corporate entity to supply Felix-Tsaboukos with PB's products, but which contact could no longer supply Felix-Tsaboukos.

49.     Had the Customer not reached out to PB independently, PB would not have been able to maintain its business relationship with the Customer, and the Customer would still incorrectly believe that PB's products could not be sold in California based on Felix-Tsaboukos's false statements and would not sell PB's products in California, thereby harming PB.

50.     PB is not yet aware of the full scope of Felix-Tsaboukos's false statements, nor the number of PB's customers Felix-Tsaboukos has already misled. Upon information and belief, Felix-Tsaboukos has made such false statements to numerous other of PB's customers and is continuing to do so.

## <u>COUNT I</u>
### (BREACH OF CONTRACT – NCA, AGAINST MEDRICK)

51.     Plaintiff re-alleges and incorporates the allegations of all of the paragraphs in this complaint as if fully set forth herein.

52.     On or about July 20, 2023, PB and Medrick entered into a valid, enforceable, and binding contracts, the APA and NCA (the "Contracts"), which are made a part hereof and whose terms are incorporated herein by reference.

53.     PB agreed to pay Two Million Dollars ($2,000,000) plus an Inventory Payment in full consideration for the contracts (the "Consideration").

54.     In exchange for PB's agreement to pay the Consideration, Medrick agreed in the NCA, *inter alia*, that:

at no time . . . shall [Medrick] . . . advise, direct or suggest in any manner to a third

party . . . that such third party (a) stop having or reduce such existing relationship with [PB], (b) not start having such a relationship with [PB], (c) during the Non-compete Period, start or increase such a relationship with any business for the Products engaged in the Industry Segment in the United States other than [PB], or (d) otherwise disparage [PB] or any person or entity affiliated with [PB].

55.     PB has performed its obligations under the contracts.

56.     All conditions precedent have been satisfied.

57.     PB has, to date, executed all payments required by the Promissory Note.

58.     On or around December 10, 2023, Medrick materially and substantially breached the NCA.

59.     Specifically, Medrick breached at least Section 1.03 of the NCA by sending the Messages to DBN, directing DBN to cease its business relationship with PB, and exerting threats against DBN in the event it failed to comply with its unlawful and tortious directions.

60.     As a direct and proximate result of Medrick's breaches, PB has suffered, and will continue to suffer, damages.

61.     The damages flow directly from and are the natural and probable consequences of Defendant's breaches.

62.     Pursuant to Section 4.02 of the NCA, PB is entitled to all expenses incurred in the present action, including reasonable attorneys' fees, costs, and disbursements.

## COUNT II
### (BREACH OF CONTRACT – APA, AGAINST MEDRICK)

63.     Plaintiff re-alleges and incorporates the allegations of all of the paragraphs in this complaint as if fully set forth herein.

64.     Section 1.7 of the APA incorporated by reference the terms of the NCA, including Section 1.03 of the NCA.

65.     All conditions precedent thereunder have been satisfied.

66.     On or around December 10, 2023, Medrick materially and substantially breached the APA.

67.     Specifically, Medrick breached the APA by materially and substantially breaching the NCA as discussed above.

68.     As a direct and proximate result of Medrick's breaches, PB has suffered, and will continue to suffer damages.

69.     The damages flow directly from and are the natural and probable consequences of Medrick's breaches.

70.     Pursuant to Section 4.02 of the NCA, PB is entitled to all expenses incurred in the present action, including reasonable attorneys' fees, costs, and disbursements.

### COUNT III
### (INTERPLEADER, AGAINST MEDRICK)

71.     Plaintiff re-alleges and incorporates the allegations of all of the paragraphs in this complaint as if fully set forth herein.

72.     As discussed herein, Plaintiff owes to Medrick certain payments due or to become due under the Promissory Note.

73.     Due to Medrick's breaches of the Contracts, Plaintiff is no longer liable to pay the remaining balance due to Medrick under the Promissory Note.

74.     Plaintiff's claims arise out of the APA, the NCA, and the Promissory Note, and Plaintiff therefore has a claim to the amount due under the Promissory Note that conflicts with Medrick's claim.

75.     Plaintiff's claim to the amounts owed under the Promissory Note conflicts with Defendant Medrick's claim to the same.

76.     Unless and until the instant action is resolved, and for the purpose of avoiding duplicative liability or contradictory judicial determinations as to Plaintiff and Medrick's legal rights, Plaintiff will, for the duration of the instant litigation, pay to the Court the remaining balance due to Medrick under the Promissory Note.

## COUNT IV
## (TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE, AGAINST ALL DEFENDANTS)

77.     Plaintiff re-alleges and incorporates the allegations of all of the paragraphs in this complaint as if fully set forth herein.

78.     PB had substantial business opportunities and a business relationship with DBN. Specifically, DBN was to act as a product distributor for PB in California and was expected to execute the Order with PB.

79.     PB had an expectation of business with other distributors with whom PB held a good reputation.

80.     PB had fostered a strong reputation with its distributors, including with DBN.

81.     In bad faith, Medrick knowingly baselessly threatened DBN in order to force DBN to cancel the Order and cease doing business with PB.

82.     Upon information and belief, Medrick made false representations, such as the Ownership Statements, to other of PB's distributors, including falsely claiming that Medrick is the

owner of DB and the marks "Pure Brazilian" and "Always Blonde."

83.     Defendant Medrick acted in bad faith and used wrongful and oppressive means and tactics, with wrongful motives, in interfering with plaintiff's prospective advantageous business relations with DBN by threatening legal action against DBN for selling PB's products, despite PB's prior termination of its relationship with Medrick and Medrick's lack of rights in PB's products.

84.     Medrick acted in bad faith and used wrongful and oppressive means and tactics, with wrongful motives, in interfering with plaintiff's prospective advantageous business relations with other distributors by making the Ownership Statements while knowing she held no ownership in PB or the marks "Pure Brazilian" and "Always Blonde."

85.     At the time she sent the Messages, Medrick knew she had no rights in PB's products.

86.     At the time she made the Ownership Statements, Medrick knew she held no ownership in PB or the marks "Pure Brazilian" and "Always Blonde."

87.     The damage to Plaintiff's business relationship with DBN would not have occurred but for Medrick's activities in that Medrick caused DBN to cancel the Order with PB and to cease its business relationship with PB.

88.     The damage to Plaintiff's reputation and business relationship with other distributors would not have occurred but for Medrick's tortious activities.

89.     As a direct and proximate result of Medrick's conduct as recounted *supra*, PB has

suffered damages in an amount to be calculated at trial but that is not less than One Hundred Thousand Dollars ($100,000) in that PB has lost the expectation of current and future sales to DBN and other distributors.

90.     The damages flow directly from and are the natural and probable consequences of Medrick's wrongful conduct.

91.     As a result of Medrick's interference with PB's prospective business advantage, Plaintiff has suffered incidental damages in the amount of at least One Hundred Thousand Dollars ($100,000) in that PB spent significant time and money marketing to distributors, including DBN, and hired additional staff to support its business development in California, including staff to handle sales to distributors like DBN.

92.     Medrick's misconduct evinced such a high degree of moral culpability as to warrant punitive damages.

93.     PB is entitled to punitive damages against Medrick in an amount to be determined at a trial.

94.     Similarly, and as alleged *supra*, Defendant Felix-Tsaboukos made false and injurious representations to at least one of PB's customers, and upon information and belief has made the same and/or other false statements to some of PB's other customers, with the intent to interfere with PB's business relationships.

95.     Defendant Felix-Tsaboukos acted in bad faith and used wrongful and oppressive means and tactics, with wrongful motives, in interfering with plaintiff's prospective advantageous

business relations with its customers with the sole intent of driving them away from doing business with PB.

96.     Felix-Tsaboukos acted in bad faith and used wrongful and oppressive means and tactics, with wrongful motives, in interfering with Plaintiff's prospective advantageous business relations with its customers, knowing full well that PB's products are and were then lawfully available in California.

97.     As a result of Felix-Tsaboukos's statements, PB's reputation and goodwill has been damaged and, upon information and belief, PB has lost customers and potential profits due to Felix-Tsaboukos's knowingly false statements.

98.     PB has been damaged by Felix-Tsaboukos's statements in an amount to be determined at trial.

## <u>COUNT V</u>
## (TORTIOUS INTERFERENCE WITH CONTRACT, AGAINST MEDRICK)

99.     Plaintiff re-alleges and incorporates the allegations of all of the paragraphs in this complaint as if fully set forth herein.

100.     PB and DBN entered into a Purchase Order Agreement (the "Agreement"). The Agreement was at all relevant times a valid, binding and enforceable contract.

101.     At all relevant times, Medrick was aware of the existence and terms of the Agreement.

102.     On or around December 10, 2023, DBN terminated the Agreement.

103.    Medrick intentionally and improperly facilitated and induced DBN's termination of the Agreement by sending to DBN baseless threats of litigation for doing business with PB.

104.    Medrick's conduct was without justification and was improper.

105.    The termination of the Agreement would not have occurred but for Medrick's activities in that DBN would not have terminated the Agreement if not for Medrick's threats conveyed in the Messages.

106.    As a result of Medrick's inducement of DBN to terminate, PB has suffered damages in an amount to be determined at trial in that PB lost sales of its products, among other damages.

107.    The damages flow directly from and are the natural and probable consequences of Medrick's inducement of DBN's termination of the Agreement.

108.    Medrick's misconduct evinced such a high degree of moral culpability as to warrant punitive damages.

109.    PB is entitled to punitive damages against Medrick in an amount to be determined at trial.

110.    Plaintiff is entitled to interest on the forgoing sums plus the costs of this action.

## <u>COUNT VI</u>
**(BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AGAINST MEDRICK)**

111.    Plaintiff re-alleges and incorporates the allegations of all of the paragraphs in this complaint as if fully set forth herein.

112.    The agreements between Plaintiff and Medrick are or were existing contracts. The

contracts included an implied covenant of good faith and fair dealing.

113.     Medrick acted in bad faith, and with improper motives, as described herein, in breaching the implied covenant of good faith and fair dealing inherent in these agreements.

114.     Medrick's actions violated the reasonable and justifiable expectations of Plaintiff under the terms of the agreements and have the effect of injuring Plaintiff's rights and ability to receive the fruits of the agreements.

115.     In particular, Medrick's actions caused Plaintiff injury due to its loss of revenue and funds and damage to its reputation.

116.     Medrick's breaches were and are a substantial factor in directly and proximately causing damages to Plaintiff.

<u>COUNT VII</u>
**(FALSE DESIGNATION OF ORIGIN UNDER 15 U.S.C. § 1125(a)(1)(A) – AGAINST MEDRICK)**

117.     Plaintiff re-alleges and incorporates the allegations of all of the paragraphs in this complaint as if fully set forth herein.

118.     Plaintiff owns valid trademark rights in the Pure Brazilian Marks.

119.     Medrick's use of the Pure Brazilian Marks without authorization in connection with the Pure Brazilian Goods, including her statements made in connection with the Pure Brazilian Goods, constitutes use that is likely to cause confusion, or to cause mistake, or to deceive consumers as to the affiliation, connection, or association of Medrick with Plaintiff, such that consumers may believe that the Pure Brazilian Goods are sponsored by, endorsed by, approved by, licensed by, authorized by, or affiliated or connected with Plaintiff.

120.     Medrick's use of the Pure Brazilian Marks without authorization in connection with

the Pure Brazilian Goods, including her statements made in connection with the Pure Brazilian Goods, constitutes use that is likely to cause confusion, or to cause mistake, or to deceive consumers as to the affiliation, connection, or association of Medrick with the Pure Brazilian Goods, such that consumers may believe that the Pure Brazilian Goods were created by, manufactured by, originated from, or sourced from Medrick and not Plaintiff.

121.    Medrick's acts constitute false designation of origin in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

122.    Upon information and belief, Medrick has, at least by making the Ownership Statements, acted intentionally, maliciously, willfully, and in bad faith for the purposes of deceiving buyers into purchasing products from Medrick based on the false belief that Medrick is authorized by Plaintiff to sell the Pure Brazilian Goods, and/or that Medrick and the Pure Brazilian Goods are otherwise affiliated with or sponsored by Plaintiff, and/or that Medrick is the source of the Pure Brazilian Goods, and with the specific intent to appropriate to Medrick and to employ for her own benefit the valuable goodwill and business reputation represented by the Pure Brazilian Marks.

123.    Medrick's acts have caused and, if permitted to remain unabated, will continue to cause Plaintiff to suffer substantial irreparable harm in the nature of loss of control over its reputation and loss of consumer goodwill, and Plaintiff has no adequate remedy at law.

124.    As a direct result of the foregoing, Plaintiff has suffered actual damages and Medrick has been unjustly enriched.

125.    Medrick's actions have been extraordinary, entitling Plaintiff to treble damages, attorneys' fees, and cost of suit, and to such other and different relief as the Court deems just and

proper.

## COUNT VIII
## (UNFAIR COMPETITION UNDER NEW YORK COMMON LAW, AGAINST MEDRICK)

126.    Plaintiff re-alleges and incorporates the allegations of all of the paragraphs in this complaint as if fully set forth herein.

127.    Medrick's misrepresentations as to the source of PB's products/goods, including but not limited to by palming off PB's products as Medrick's own, are likely to cause confusion, or to cause mistake, or to deceive the consuming public and others as to the origin or source of Medrick's products.

128.    As a result of Medrick's unauthorized and wrongful conduct, the public is likely to be confused as to whether Medrick's products and business are associated with PB.

129.    Medrick's conduct is willful and violates Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

130.    Medrick's conduct is ongoing, is causing irreparable injury to PB, and will continue to both damage PB and deceive the public, unless and until enjoined by this Court.

131.    PB has no adequate remedy at law.

## COUNT IX
## (VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, AGAINST MEDRICK)

132.    Plaintiff re-alleges and incorporates the allegations of all of the paragraphs in this complaint as if fully set forth herein.

133.    Medrick's misrepresentations as to the source of PB's products/goods, including but not limited to by palming off PB's products as Medrick's own, are likely to cause

confusion, or to cause mistake, or to deceive the consuming public and others as to the origin or source of Medrick's products.

134.    Medrick's unauthorized and wrongful conduct is likely to deceive the public as to whether Medrick's products and business are associated with PB.

135.    Medrick's conduct is willful and constitutes an unlawful act, as her conduct violates Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

136.    Medrick's conduct is ongoing, is causing irreparable injury to PB, and will continue to both damage PB and deceive the public, unless and until enjoined by this Court.

137.    PB has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment as follows:

A.    Granting judgment in favor of Plaintiff and against Defendants on all claims and a final judgment incorporating the same;

B.    An award of actual damages to Plaintiff;

C.    An award of restitution and disgorgement of any ill-begotten profits;

D.    Adjudging that Medrick has breached the Contracts between the parties;

E.    Adjudging that Defendants have tortiously interfered with Plaintiff's prospective business advantage;

F.    Adjudging that Medrick has tortiously interfered with contract;

G.    Adjudging that Medrick has breached the implied covenant of good faith and fair dealing;

H.     Adjudging that Medrick wrongfully passed of PB's products as her own;

I.     Adjudging that Medrick's conduct amounts to unfair competition;

J.     Adjudging that Medrick's conduct amounts to a false designation of origin;

K.     Granting an injunction temporarily, preliminarily, and permanently enjoining Medrick, her employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and all of those in active concert and participation with any of the foregoing persons or entities, including but not limited to Felix-Tsaboukos, from:

(a) Making any use of the "Pure Brazilian" or "Always Blonde" marks, or any designation of origin confusingly similar thereto, including offering to sell, selling, distributing, or importing into the U.S. PB's products bearing the "Pure Brazilian" or "Always Blonde" marks;

(b) Infringing or diluting any of PB's trademarks;

(c) Unfairly competing with PB in the manufacture, importation, advertising, offering for sale, sale, shipment and/or distribution of PB's products;;

(d) Tortiously interfering with PB's current and potential customers and distributors;

(e) Making any implied or express statements that are likely to cause consumers to believe that the Pure Bazilian Goods, or any of PB's products, originate from Medrick, or are associated with, or endorsed or sponsored by Medrick, or that PB and Medrick are related to one another, in connection with any marketing, promoting, advertising, selling, or distribution of any of the Pure Bazilian Goods, or any of PB's products; and

       (f)  Assisting, aiding or abetting any other person or business entity in engaging in or performing any of the aforementioned activities.

L.     Order Defendants, pursuant to 15 U.S.C. § 1116, to serve on PB within thirty (30) days after service on Defendants of a preliminary or permanent injunctive order, a report in writing, under oath, setting forth in detail the manner and form in which Defendants have complied with the injunction.

M.    Ordering an accounting by Medrick of all gains, profits and advantages derived from its wrongful acts;

N.     Ordering third parties to freeze Medrick 's accounts;

O.     Ordering Medrick to account for, and pay over to Plaintiff, Medrick's profits and all damages sustained by Plaintiff;

P.     Ordering that Medrick pay to Plaintiff, in accordance with 15 U.S.C. § 1117(a), and all other applicable state laws, such damages as Plaintiff has suffered in consequence of Medrick's infringement of the Pure Brazilian Marks and from the above-described acts, including but not limited to the following:

       (a)  Three times all gains and profits derived by Medrick from the above-described acts, or, in the alternative, three times Plaintiff's lost profits, whichever is greater;

       (b)  Reasonable attorneys' fees and cost of suit incurred in this action; and

       (c)  Punitive damages as provided for under applicable federal and state law;

Q.      Increase the amount of damages and/or profits awarded to Plaintiff, as provided by law;

R.      Awarding Plaintiff the fees, costs and disbursements, and interest, expended in connection with any actions taken to investigate and confirm the claims made herein;

S.      Declaring Plaintiff as the prevailing party and awarding Plaintiff its reasonable attorneys' fees as provided by the Contracts and by law;

T.      Ordering that Medrick pay all fees, expenses, and costs associated with this action as provided by the Contracts and by law;

U.      Award Plaintiff its reasonable attorneys' fees, costs, disbursements, and interest, including pre-judgment interest and post-judgment interest, as provided by the Contracts and by law; and

V.      Grant such other and further relief as the Court may deem just and proper.


Dated: January 31, 2024
     New York, New York

              /s/ Andrew D. Bochner
              Andrew D. Bochner, Esq.
              Jeremy M. Doberman, Esq.
              **Bochner PLLC**
              1040 Ave. of the Americas, 15th Fl.
              New York, New York 10018
              (646) 971-0685
              Andrew@Bochner.Law