IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PURE BRAZILIAN USA LLC,<br><br>        Plaintiff,<br><br>v.<br><br>CHRISTINE MEDRICK and<br>YVETTE FELIX-TSABOUKOS,<br><br>        Defendants. | Civil Action No.: 1:2023-cv-10946 |

### Declaration of Joseph Indig
### in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction

I, Joseph Indig, being of lawful age, hereby declare under penalty of perjury as follows:

1. I am the CEO of Pure Brazilian USA LLC ("Plaintiff" or "PB"), the Plaintiff in the above-captioned case.

2. I submit this declaration in support of Plaintiff's Motion for a Preliminary Injunction and Temporary Restraining Order against Defendant Christine Medrick ("Medrick").

3. I make this declaration based upon my personal knowledge and the knowledge I have gained in my role as CEO of PB. If called to do so, could and would testify to the same.

4. PB is a New York limited liability company with its principal place of business located at 15 Holt Drive, Stony Point, New York 10980.

5. PB is a manufacturer and seller of high-quality beauty and haircare products which sells its products nationwide under brand names including "Pure Brazilian" and "Always

Blonde," utilizing a wide network of distributors to sell its products. PB is highly respected among its distributor network.

6. Upon information and belief, Medrick is a citizen of Arizona and resides at 14455 N. Adero Canyon Drive, Fountain Hills, Arizona.

7. On or about July 20, 2023, PB and Medrick entered into an Asset Purchase Agreement (the "APA") for the purchase of substantially all assets of CCbeauty which was then owned by Medrick.

8. CCbeauty formerly manufactured and sold beauty and haircare under the brand names "Pure Brazilian" and "Always Blonde," until those trademarks were purchased by PB.

9. Under the APA, PB agreed to pay Two Million Dollars ($2,000,000) plus an Inventory Payment in full consideration therefor.

10. Executed with the APA was a Non-Compete Agreement (the "NCA"), under which Medrick covenanted not to compete with PB.

11. The NCA provides, in part, that Medrick shall not:

    (i)  have an equity or creditor interest in, or (ii) act as an employee, consultant, advisor, officer of manager (in each case, howsoever, denominated) of, any entity which engages in business activity insofar as it relates to the Industry Segment by manufacturing, promoting or making sales of products . . . in the Industry Segment[.]

    (ii) advise, direct or suggest in any manner to a third party . . . that such third party (a) stop having or reduce such existing relationship with [PB], (b) not start having such a relationship with [PB], (c) during the Non-compete Period, start or increase such a relationship with any business for the Products engaged in the Industry Segment in the United States other than [PB], or (d) otherwise disparage [PB] or any person or entity affiliated with [PB].

12. Under the APA, PB agreed to pay two million dollars ($2,000,000) plus an Inventory Payment in full consideration therefor under the APA.

13. On the same day, PB and Medrick executed a Secured Non-Negotiable Promissory Note (the "Promissory Note"), which required a portion of the consideration for the APA to be paid out over a series of installments.

14. To date, PB has timely paid every installment due to Medrick under the Promissory Note.

15. Following the execution of the APA and NCA and enabled by its purchase of substantially all of CCbeauty's assets, PB sought to grow its business in California, one of the U.S.'s largest markets. PB invested significant time and money in a number of areas to achieve this end, including by hiring a head of sales, a product educator, and at least two sales staff members, and by establishing and growing a distributor network in California.

16. Thanks to those efforts, PB developed a strong business relationship with Sevak Orujyan, a representative of Daily Beauty Needs LLC d/b/a Beauty Sign ("DBN"), a product distributor in California.

17. DBN and PB entered into an agreement appointing DBN as PB's exclusive distributor in southern California, and DBN subsequently placed product orders with PB in accordance with that agreement.

18. Following the APA and NCA, Medrick acted as an authorized distributor of PB's products, which relationship was not pursuant to any written agreement or contract.

19. Medrick's role as a distributor of PB's products was non-exclusive, non-binding, and quite brief. Shortly after Medrick began distributing PB's products, the relationship broke down as a direct result of Medrick's conduct.

20. PB requires its distributors to provide PB with a list of all customers to which the distributor had sold PB's products, but Medrick refused to provide any such list.

21. Medrick also began selling PB's products above its retail price, and she repeatedly refused to adjust her pricing of PB's products to reflect PB's occasional discounts.

22. Without authorization or permission from PB, Medrick unilaterally decided to act as a reseller of PB's products and not as a distributor. Due to Medrick's conduct, PB terminated her as an authorized distributor of PB's products on or about November 15, 2023.

23. Although PB informed Medrick that she is no longer authorized to distribute PB's products, Medrick has continued to sell PB's products. After being so informed, Medrick had no ownership, authorization, or rights to PB, its products, or its brands.

24. Despite the APA and NCA, Medrick has disparaged PB, its business, and its products to PB's customers and business partners.

25. For instance, Medrick made false statements and threats to PB's distributors, including Daily Beauty Needs LLC d/b/a Beauty Sign ("DBN"). PB had previously appointed DBN as its exclusive distributor in southern California.

26. DBN had placed an order with PB in the amount of $10,000, which was cancelled due to Medrick's baseless threats of litigation against DBN for its relationship with PB.

27. Medrick made these threats to DBN intentionally, with malice to harm PB, and despite knowledge that she (a) had no standing, cause, or justification to do so and (b) had no rights in PB's brand, products, or the exclusive sale of the same.

28. In addition, on or about December 15, 2023, PB was contacted by a customer who stated that Medrick had held herself out as an authorized distributor of PB and was attempting to fulfill this customer's order of PB's products.

29. PB has also come to learn that Medrick was obtaining PB products from co-defendant Yvette Felix-Tsaboukos ("Felix-Tsaboukos") for resale to customers, with whom Medrick had a close relationship.

30. On December 19, 2023, a longtime customer of PB informed us that Medrick and Felix-Tsaboukos were misrepresenting to PB's customers that PB's products are no longer available in California, which is not true.

31. Neither Medrick nor Felix-Tsaboukos were authorized to sell PB's products, nor to make any such statements.

32. PB is not yet aware of the full scope of Medrick's false statements and tortious behavior, nor has it discovered and tabulated just how many of PB's customers Medrick has already misled, but PB believes Medrick has made similar false statements to numerous other of PB's customers and is continuing to do so PB's reputation and goodwill with its customers has been irreparably damaged as a result of Medrick's false statements.

33. PB has lost profits and revenues as a result of Medrick's statements and continued, unauthorized sales of PB's products.

34. PB has also lost business relationships with third-parties, including but not limited to DBN, due to Medrick's false statements and interference with PB's business.

    I declare under penalty of perjury that the foregoing is true and correct.

Executed on:   January 25, 2024
               New York, NY

/s/     Joseph indig